UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 24-46-CJS

NAHED BAYS                                                                PLAINTIFF

v.                          **MEMORANDUM OPINION AND ORDER**

KENTON COUNTY AIRPORT BOARD                                              DEFENDANT

\*\*\*  \*\*\*  \*\*\*  \*\*\*

In this action, Plaintiff Nahed Bays brings claims against Defendant Kenton County Airport Board ("the Board") under the Family and Medical Leave Act for interference and retaliation and under the Kentucky Civil Rights Act for national origin discrimination. (*See* R. 1). The parties have consented to the jurisdiction of the undersigned to conduct all proceedings, including entry of judgment, in accordance with 28 U.S.C. § 636(c). (*See* R. 10; R. 11). Presently before the Court is the Board's Motion for Summary Judgment (R. 31), to which Bays responded in opposition (R. 39), and the Board replied in support (R. 40). For the reasons stated herein, the Board's Motion for Summary Judgment (R. 31) will be **granted**.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

Bays, a Lebanese national, moved to the United States in 1993 and became a citizen in 1994. (R. 31-2 at Page ID 109-10). From 2017 to 2022, she worked for United Parcel Service (more commonly known as UPS) in various positions. (*Id.* at Page ID 105). She started working at UPS as a Truck Loader before transitioning into another role as a Safety Supervisor. (*Id.*; *see also* R. 39-1 at Page ID 928, ¶ 5). During her time at UPS, in 2020, Bays was diagnosed with breast cancer. (R. 31-2 at Page ID 120-21).

In May 2022, Bays left UPS to work at the Board.  (*Id.* at Page ID 105; *see also* R. 39-1 at Page ID 928, ¶ 6).  Bays began working at the Board on May 22 (or 23), 2022, as a Safety Training Specialist.  (*See* R. 31-2 at Page ID 124 (deposition testimony suggesting Bays started at the Board May 22, 2022); *but see* R. 1 at Page ID 2, ¶ 10 (alleging Bays became employed May 23, 2022)).  In general terms, Bays was tasked with conducting, managing, and overseeing safety training programs for the Board.  (R. 31-3 at Page ID 324).  During her time at the Board, Bays was a member of a small team led by Chris Snyder.  (R. 31-2 at Page ID 113, 116).  Aside from Bays and Snyder, there were two other members in that work unit: Tara Ferring and Todd Bahlau.  (*Id.* at Page ID 116).

While Bays was employed by the Board, she required ongoing treatment for her cancer, so, at the beginning of her employment, Snyder told Bays that she could flex her schedule, as needed, to attend medical appointments.  (*Id.* at Page ID 125).  In effect, this meant Bays could work extra time on days she did not have appointments, so she could work fewer hours on days she did.  (*Id.* at Page ID 126).  Toward the end of 2022, however, Human Resources ("HR") informed Snyder that Bays could no longer flex her schedule to accommodate her appointments.  (*Id.* at Page ID 126-27).  Snyder then informed Bays that she had to work eight hours per day Monday through Friday, without exception for medical appointments.  (*Id.* at Page ID 131-32, 137 (Bays testifying she was told in January 2023 that the flexible schedule was no longer available)).  Meanwhile, according to Bays, Ferring and Bahlau were permitted to have more flexible work schedules and were treated more favorably.  (*Id.* at Page ID 113-14, 123, 128-30).

A separate (but related issue) with how Bays approached the hours she was to work arose during this time too; specifically, Bays would often miss work.  Eventually, Bays's absenteeism

became a point of contention between her and the Board.[1]  For example, on December 16, 2022, Snyder gave Bays a verbal warning based on six occurrences of sick leave or tardiness that occurred between August 2 and November 3, 2022.  (R. 35 at Page ID 518; R. 35-6 at Page ID 636).  Then, on February 17, 2023, after Bays inquired about FMLA leave, she was informed by the Board that she would not be eligible for such leave until she had worked for the company for a year.  (R. 31-3 at Page ID 369).  And three days later, Bays received a written warning from Snyder because she missed work on February 9, 10, and 13, 2023.  (R. 35-10).  At that time, she was warned that her attendance needed to improve and that future violations of the Board's policies and procedures would "lead to further discipline up to and including termination."  (*Id.*).

On February 23, 2023, Snyder and Bays signed an Employee Coaching Form that detailed seven incidents—between November 30, 2022, and February 15, 2023—where Bays either performed below expectations or was absent from work.  (R. 35-9).  Three future sessions to review Bays's progress were set, and Bays was informed of the Board's expectations that she follow all company policies related to attendance, reliability, and job performance.  (*Id.* at Page ID 644).  In April 2023, during one of the scheduled review sessions, Snyder found that Bays had not met the goals set forth in the Coaching Form. (R. 35-11).  Bays was then again tasked with abiding by the attendance policy.  (*Id.*).

On May 11, 2023, Bays emailed HR to see if there was any required paperwork for her to complete to be away from work between June 1 and June 5, 2023, for a surgery.  (R. 37-2; *see also* R. 39 at Page ID 915).  Her inquiry was entered into the HR system as an FMLA leave request.  (R. 37-1).  Four days later, Gina Stough, the Vice President of Human Resources for the Board, indicated in an email to Candace McGraw, CEO, whom she reported to, that Bays's conduct was

---

[1] The Board's Reply in support of its dispositive motion provides a helpful chart documenting Bays's issues with attendance and performance.  (*See* R. 40).

"nearing a terminable level" due to "blatant attendance non-compliance, and poor work performance." (R. 37-5; *see also* R. 37 at Page ID 788).

Around this time in mid-May 2023, Bays scheduled a training session for May 17, 2023. (*See, e.g.*, R. 37-8 at Page ID 906). Multiple employees came to attend the session, but Bays failed to appear without notice. (*Id.* (noting that Bays "was not at work" and that "[t]here were 3 different calendars/notes with 3 different times scheduled for this same class"); R. 31-4 at Page ID 437, ¶ 5; *see also* R. 35-15 (text exchange between Snyder and Ferring discussing Bays's missed session)). The Board found Bays's oversight particularly egregious because Snyder was out of town. (R. 31-4 at Page ID 437, ¶ 5). Snyder then recommended that the Board terminate Bays due to her history of absenteeism and her failure to appear at the training session. (R. 35 at Page ID 555-56). Upon review of Bays's employee file, Stough likewise determined Bays "should be terminated for her absenteeism and overall sub-standard performance." (R. 31-4 at Page ID 438, ¶ 6). Bays was ultimately terminated on May 18, 2023. (R. 31-2 at Page ID 124).[2]

On April 1, 2024, Bays filed a civil complaint in this Court, naming the Board as Defendant. (R. 1). The Complaint includes three claims: Family Medical Leave Act ("FMLA") interference; FMLA retaliation; and violation of the Kentucky Civil Rights Act ("KCRA") for national origin discrimination. (*See id.*). On May 31, 2024, the Board filed its Answer. (R. 8). In their Joint Discovery Plan Pursuant to Fed. R. Civ. P. 26(f), the parties unanimously consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c). (R. 10). This matter was then reassigned to the undersigned "to conduct all proceedings, including entry of judgment." (R. 11 at Page ID 33).

---

[2] After Bays was terminated, she was unemployed for around two months. (R. 31-2 at Page ID 104). During that time, she collected unemployment insurance payments. (*Id.*). Bays was then hired by Haag-Streit, USA in Mason, Ohio, as an Environmental Health and Safety Coordinator. (*Id.* at Page ID 100-01). There, Bays makes around $82,000 per year. (*Id.* at Page ID 101).

On June 13, 2024, a Scheduling Order was entered in this action. (R. 13). Under the Scheduling Order, as amended, discovery in this action closed on May 14, 2025, and the parties were to file any dispositive and *Daubert* motions by June 13, 2025. (R. 24). On June 13, 2025, the Board timely filed a Motion for Summary Judgment. (R. 31). Bays responded (R. 39), and the Board replied (R. 40). This matter now stands submitted for review.

## II.    LEGAL STANDARD

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56. That Rule provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Rule 56, once the movant has met its burden, the burden shifts to the nonmovant to present "specific facts showing that there is a genuine issue for trial." *Arendale v. City of Memphis*, 519 F.3d 587, 593-94 (6th Cir. 2008) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

When ruling on motions for summary judgment, courts accept the nonmovant's evidence as true and draw all reasonable inferences in favor of the nonmovant. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, to survive summary judgment, the nonmovant cannot rely on "conjecture or conclusory accusations" but must instead be able to show sufficient probative evidence that would permit a finding in her favor on more than mere speculation, conjecture, or fantasy. *Arendale*, 519 F.3d at 605 (citing and quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). Conclusory assertions supported only by, for example, a plaintiff's own opinions cannot withstand a motion for summary judgment. *Id.*

5

### III.   ANALYSIS

Through her Complaint, Bays alleges claims of FMLA interference, FMLA retaliation, and national origin discrimination under the KCRA. (R. 1). The Board has moved for summary judgment on all of Bays's claims. (R. 31). For the reasons discussed below, the Board's motion will be granted in full.

### A.   FMLA Claims

Bays's first two claims allege that the Board violated her FMLA rights. As background, under the FMLA, "qualifying employees" are entitled to unpaid medical leave if certain conditions are met. *See Edgar v. JAC Products, Inc.*, 443 F.3d 501, 506 (6th Cir. 2006). In particular, Section 105 of the Act "prohibits covered employers from interfering with, restraining, or denying the exercise of their employees' rights under the statute, and also makes it 'unlawful for any employer to discharge or in any manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. *Id.* at 507 (quoting 29 U.S.C. § 2615(a)(1), (a)(2), (b)). And Section 107 provides a private right of action against employers found liable under the Act. *Id.* (citing 29 U.S.C. § 2617(a)(1), (a)(2)). Two separate theories of recovery arise under the FMLA: entitlement (or interference) and retaliation. *Id.* Bays brings a claim under each theory.

Importantly, claims of FMLA interference, *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427 (6th Cir. 2014), and FMLA retaliation, *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 379 (6th Cir. 2017), based on indirect evidence are assessed under the burden-shifting framework provided in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that structure, "the employee has the initial burden of establishing her prima facie case; if she does so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; finally, the employee has the burden of rebutting the employer's proffered reasons by

6

showing them to be pretextual." *Demyanovich*, 747 F.3d at 427 (pronouns modified).  In the case at bar, because Bays's FMLA claims are premised on indirect evidence (*see generally* R. 1), the Court will assess whether Bays has made a prima facie showing under both theories first and then, if necessary, turn to the burden shifting analysis.

### 1.    Prima Facie Showing

#### a.    FMLA Interference

To establish a prima facie case for her FMLA interference claim, Bays must show that:

> (1) she was an eligible employee; (2) the defendant was a covered employer under the FMLA; (3) she was entitled to take leave under the FMLA; (4) she notified her employer of her intent to take leave; and (5) the employer denied her benefits or rights to which she was entitled under the FMLA.

*Demyanovich*, 747 F.3d at 427 (citing *Edgar*, 443 F.3d at 507) (pronouns modified).  In its Motion for Summary Judgment, the Board puts only element one in issue.[3]  Specifically, the Board argues that, because Bays requested leave and was terminated before she was employed for a year, she was not an "eligible employee" under the Act and that she was, therefore, not entitled to leave.  (R. 31-1 at Page ID 84-85).  Bays rejects this position, arguing that her eligibility turns on the date on which her leave would have begun, not on the date she requested it or was terminated.  (R. 39 at Page ID 918).

An eligible employee is defined in the FLMA as "an employee who has been employed—(i) for at least 12 months by the employer with respect to whom leave is requested . . . ; and (ii) for

---

[3] The Board does briefly address the third element by arguing that Bays was not entitled to take FMLA leave.  (*See* R. 31-1 at Page ID 84).  However, the Board raises this point only in passing and does not address how Bays fails to make the requisite showing.  (*See id.*).  Consequently, the Court finds this conclusory argument waived.  *See, e.g.*, *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." (cleaned up)).  And, for reasons discussed in more detail below, the Court also finds Bays has discharged her burden as to this element.

at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). "The determination of whether an employee meets the FMLA's eligibility requirements is made in reference to the date the employee commences his or her leave, not the day the employer takes an adverse action against the employee." *Ricco v. Potter*, 377 F.3d 599, 604 n.4 (6th Cir. 2004). Further, the Sixth Circuit has held that FMLA "leave commences upon the occurrence of the first absence caused by [a chronic health] condition, and it extends to cover every other absence caused by that condition during the same twelve-month FMLA period." *Davis v. Mich. Bell Tel. Co.*, 543 F.3d 345, 350 (6th Cir. 2008). In effect, "absences caused by the same chronic condition, but occurring in different twelve-month FMLA periods, must constitute different periods of FMLA leave [and thus] must have different times of commencement." *Id.* at 351.

Bays started working at the Board on May 22 (or 23), 2022 (*see* R. 31-2 at Page ID 124; R. 1 at Page ID 2, ¶ 10)), and her requested leave was set to begin on June 1, 2023 (R. 37-2). Bays had taken time off work for various appointments related to the same chronic condition (cancer) during her time at the Board. (*See, e.g.*, R. 31-3 at Page ID 366). Importantly, however, she requested FMLA leave that would begin in the period *after* she had been with the Board for a year. In other words, her requested FMLA leave would have commenced in a period in which she could be eligible under the Act. As such, her leave did not commence until June 1, 2023, *see Davis*, 543 F. 3d at 351, which (again) occurred more than 12 months after her employment began with the Board. And while there is no direct evidence that Bays worked the required 1,250 hours during the preceding FMLA period, there is enough evidence in the record to suggest Bays satisfied that threshold. Thus, Bays was an eligible employee under the Act. *See Cross v. Dental Assisting Acad. of Louisville, LLC*, 417 F. Supp. 3d 836, 837 (W.D. Ky. 2019) ("But what happens when an

8

employee provides notice of intended leave (as the Act requires) which will commence after the employee has been working for twelve months, but the employee is fired just before meeting the twelve-month requirement?  Are those employees protected under the Act?  For the reasons stated herein, the Court finds that they are.").

Further, the Court finds there is sufficient evidence in the record to conclude that Bays has established a prima facie case for her FMLA interference claim.  To begin, the Board admits that it is an employer covered by the Act (element two), that Bays informed the Board of an upcoming surgery and inquired about the paperwork necessary to take FMLA leave prior to her termination (element four), and that it terminated Bays after she requested the FMLA forms (element five). (*See* R. 8 at Page ID 21, ¶¶ 1, 5).  These admissions discharge Bays's burden with respect to elements two, four, and five.  *See Milman v. Fieger & Fieger, P.C.*, 58 F.4th 860, 873 (6th Cir. 2023) (holding an employer was on sufficient notice that it was required to inquire further after an employee requested to take leave to care for her son).

Bays has also established element three—that she is entitled to FMLA leave.  Relevant here:

> The FMLA entitles an employee to medical leave if the employee has "a serious health condition that makes the employee unable to perform the functions of the position."  29 U.S.C. § 2612(a)(1)(D).  Under the FMLA, a serious health condition is "an illness, injury, impairment or physical or mental condition that involves inpatient care . . . or continuing treatment by a health care provider."  29 C.F.R. § 825.113(a).  "Continuing treatment" includes "chronic serious health conditions," which means conditions that require "periodic visits (defined as at least twice a year)," continue "over an extended period of time," and may "cause episodic rather than a continuing period of incapacity."  29 C.F.R. § 825.115(c)(1)-(3).

*Tillotson v. Manitowoc Co., Inc.*, No. 15-cv-14479, 2017 WL 467404, at *7 (E.D. Mich. Feb. 3, 2017).  Bays requested leave for a surgery necessitated by cancer.  (R. 31-2 at Page ID 141-42 (Bays stating she informed the Board that she had scheduled a surgery related to her cancer for June 2023); R. 37-2 (email from Bays advising of a June 2023 surgery and inquiring about any

paperwork necessary before she took leave); *see also* R. 40 at Page ID 932-39 (documenting instances Bays took sick leave)).  On this record, the Court finds Bays discharged her burden of establishing a "serious health condition."  Accordingly, Bays has made out a prima facie case of FMLA interference.

### b.     FMLA Retaliation

To establish a prima facie case for her FMLA retaliation claim, Bays must show that:

> (1) she engaged in protected activity, (2) her employer was aware of the protected activity, (3) she was subject to an adverse employment action, and (4) there was a causal nexus between the protected activity and the adverse employment action.

*Demyanovich*, 747 F.3d at 433 (pronouns modified).  Applying the facts of the instant case to these elements, first, Bays's request for leave constituted a protected activity.[4]  *See Milman*, 58 F.4th at 571 ("Thus, the scope of protected activity under the FMLA starts with the first step contemplated under the Act's procedures: a request made to the employer.  That request, moreover, need not lead to entitlement in order to be protected.").  Second, the Board was aware of her request (*e.g.*, R. 8 at Page ID 21, ¶ 1 (admitting Bays informed the Board of her surgery and requested FMLA paperwork before she was terminated)) and third, the Board took adverse action against Bays when it terminated her.  Fourth, the seven-day gap between Bays's leave request and her termination satisfies the causal nexus requirement.  *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (holding that a termination two months after a leave request satisfied the fourth element of an FMLA retaliation claim because "the burden of proof at the prima facie stage is minimal").  Accordingly, Bays has established a prima facie case of FMLA retaliation as well.

---

[4] The Board challenges this conclusion, arguing in part that Bays never put the Board on proper notice.  (R. 31-1 at Page ID 86-87).  However, case law supports a finding that, by inquiring about leave, Bays engaged in a protected activity.  *E.g.*, *Milman*, 58 F.4th at 571.  Consequently, the Board's argument is without merit.

10

### 2.    Legitimate Business Reason(s)

Because Bays has discharged her burden to establish prima facie cases of FMLA interference and retaliation, "the burden shifts to the [Board] to articulate a legitimate, nondiscriminatory reason for" its actions, namely terminating her. *Demyanovich*, 747 F.3d at 427, 433; *see also Mullendore v. City of Belding*, 872 F.3d 322, 328-29 (6th Cir. 2017) ("Interference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." (cleaned up)).  If the Board can establish a legitimate, non-FMLA related reason for Bays's termination, the burden shifts back to Bays to show the offered reason was pretextual. *Demyanovich*, 747 F.3d at 427, 433.

For its part, the Board states that it fired Bays because she did not follow attendance policies and did not meet the standards for her position.  (R. 40 at Page ID 941; *see also* R. 31-4 at Page ID 438, ¶ 6).  The record supports the Board's stated reasons.  Indeed, during the year Bays was employed by the Board, she missed work (by either leaving early, taking leave, or not showing up) on 50 Fridays.  (*See* R. 37-9).  Further, during her time with the Board, she received warnings and was placed on an improvement plan because of her absenteeism and sub-standard work performance.  (*See, e.g.*, R. 35-6; R. 35-10; R. 35-9; R. 35-11).

Although it is true that Bays requested FMLA leave on May 11, 2023, a week before she was terminated (*see* R. 37-2), concerns about her attendance and performance predated that time.  These concerns are reflected in a May 15, 2023 email from Stough, the Vice President of Human Resources for the Board, to CEO McGraw that Bays's conduct was "nearing a terminable level" due to "blatant attendance non-compliance, and poor work performance."  (R. 37-5 at Page ID 894; *see also* R. 37 at Page ID 788).  Two days after that email, on May 17, 2022, Bays failed to

11

appear without notice at a scheduled training session she was tasked with instructing. (R. 31-4 at Page ID 437, ¶ 5; *see also* R. 35-15 (text exchange between Snyder and Ferring discussing Bays's missed training session); R. 37-8 at Page ID 906 ("Timeline of Excuses and Correction Actions")). Snyder then recommended Bays's termination based on her failure to abide by her improvement plan and her failure to appear at the training session. (R. 35 at Page ID 555-56). Upon review of Bays's employee file, Stough determined Bays "should be terminated for her absenteeism and overall sub-standard performance." (R. 31-4 at Page ID 438, ¶ 6). On this record, the Board has articulated legitimate business reasons for Bays's termination.

### 3.     Pretext

Bays now "has the burden of rebutting the [Board]'s proffered reasons by showing them to be pretextual." *Demyanovich*, 747 F.3d at 427, 433. To establish pretext, a plaintiff must show "that the proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination." *Marshall*, 854 F.3d at 379 (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012)). Notably, in her response brief, Bays does not directly address her burden to establish pretext under the *McDonnell Douglas* framework. (*See generally* R. 39). Bays does, however, argue in passing that the Board's reasons for terminating her are "cherry-picked, exaggerated criticisms—suddenly materializing **after** her FMLA request" and "are evidence of pretext and retaliation." (*Id.* at Page ID 914 (emphasis in original)).

Bays's contention is without merit for two reasons. First, the record belies her position. As discussed more thoroughly above, Bays was put on notice of her misconduct as early as December 16, 2022, when Snyder gave her a verbal warning. (R. 35-6). The Board then took further corrective measures in February 2023 (R. 35-10 (written warning); R. 35-9 (performance

12

improvement plan, titled "Employee Coaching Form"))[5] and April 2023 (R. 35-11 (review session)). Moreover, one of the leading factors in Bays's termination—her missed training session—took place on May 17, 2023, four days after she requested FMLA paperwork. (*See* R. 35 at Page ID 555-56 (Snyder indicating Bays's missed training session was one of the reasons he recommended her termination)). As such, the Board could not have known of that reason until after she had requested leave (because the reason—the missed training—had not yet occurred).

Second, to the extent Bays is arguing that temporal proximity renders the Board's justification pretextual, such an argument does not prevail as temporal proximity between a protected activity and an adverse action, cannot, alone, establish pretext. *See Donald*, 667 F.3d at 763; *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001 ("[T]emporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual."). Bays therefore cannot establish pretext by only pointing to the short period between her requested leave and her termination.

Consequently, the Board's dispositive motion (R. 31) will be granted as to Bays's FMLA claims.

### B.   KCRA Violation

Finally, Bays claims that she was discriminated against based on her national origin in violation of the KCRA. (*See* R. 1 at Page ID 4). The KCRA makes it unlawful for an employer "[t]o fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's . . . national origin." KRS 344.040(1)(a); *see also Marrero-Perez v. Yanfeng*

---

[5] Bays contends her performance improvement plan does not support a legitimate business reason for her termination because it called for three review sessions but there is no documentation that the sessions actually occurred. (R. 39 at Page ID 915). But the record demonstrates it was a culmination of issues, not just her failure to meet the performance plan's goals, that led to her termination.

13

*US Auto. Interior Sys. II LLC*, No. 3:21-cv-645-RGJ, 2024 WL 5239457, at *4 (W.D. Ky. Dec. 27, 2024). Under the KCRA, it is "also unlawful for an employer to 'limit, segregate, or classify employees in any way which would deprive or tend to deprive an individual employment opportunity or otherwise adversely affect [her] status as an employee, because of the individual's national origin.'" *Marrero-Perez*, 2024 WL 5239457, at *4 (quoting KRS 344.040(1)(b)). The KCRA is the state counterpart to Title VII, and "because the language of the KCRA mirrors that of its federal counterpart, courts interpret the KCRA consistently with federal anti-discrimination law." *Marrero-Perez*, 2024 WL 5239457, at *4 (cleaned up); *Charalambakis v. Asbury Univ.*, 488 S.W.3d 568, 575 (Ky. 2016) ("Because of the substantial similarity of the respective texts and objectives, we interpret the civil rights provisions of KRS Chapter 344, in both the discrimination and retaliation contexts, consistent with the analogous federal anti-discrimination statutes.").

As with her FMLA claims above, because Bays does not point to direct evidence of discrimination, her KCRA claim will be analyzed under the familiar *McDonnell Douglas* framework, whereby she must first make out a prima facie case. *See Charalambakis*, 488 S.W.3d at 577; *see also Marrero-Perez*, 2024 WL 5239457, at *4. To do so, she must show she: (1) was a member of a protected class, (2) was discharged, (3) was qualified for the position from which she was discharged, and (4) was replaced by a person outside the protected class or treated differently than a similarly situated individual. *Marrero-Perez*, 2024 WL 5239457, at *4 (citing KRS 344.040(1)(a); *Charalambakis*, 488 S.W.3d at 577). If Bays can establish a prima facie case, the burden of production shifts to the Board to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Marrero-Perez*, 2024 WL 5239457, at *4. If the Board articulates such a reason, the burden then shifts back to Bays to show by a preponderance of the evidence that

14

the proffered reason is pretext for unlawful discrimination—"that is, that the employer's proffered reason was false, and that discrimination was the real reason." *Id.* (cleaned up).

As to her KCRA claim, Bays focuses on her prima facie case, which she maintains she satisfies. However, Bays's ability to establish certain elements of her prima facie case is questionable at best. For example, it is unlikely that Bays has identified an adequate comparator under the fourth element. For this element, the case law holds that "[e]mployees are similarly situated when they are similar in all relevant respects," *Marrero-Perez*, 2024 WL 5239457, at *5 (internal quotation marks omitted), and in making this inquiry, "[i]t is appropriate for the Court to consider differences in job title, responsibilities, experience, and work record," *id.* (cleaned up). Although Bays points to Ferring and Bahlau as other workers in her department who were treated more favorably than she was, she testified that they all had different jobs, positions, and duties. (*See, e.g.*, R. 31-2 at Page ID 129-30). It is thus not clear that these individuals should be considered similarly situated for purposes of establishing Bays's prima facie case.

But even assuming Bays could establish a prima facie case,[6] she has offered no evidence to show by a preponderance of the evidence that Defendant's proffered reasons, *i.e.*, "her

---

[6] Bays challenges the Board's position that she was not qualified under the second element because her performance was allegedly "substandard." Here, Bays argues that "[c]ourts have consistently held that the 'qualifications' prong of the *McDonnell Douglas* prima facie case refers to *objective* job criteria—such as required education, certifications, or prior experience—not to *subjective* post hoc criticisms." (R. 39 at Page ID 924 (citing *Shrivastava v. RBS Citizens Bank, N.A.*, 227 F. Supp. 3d 824 (E.D. Mich. 2017); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003)). However, certain Title VII case law frames the inquiry on the second element of a prima facie case as whether the plaintiff "was qualified for [her] job and performed it satisfactorily." *See Kirkendall v. Boone Cnty. Bd. of Educ.*, No. 2:22-cv-26-DLB-CJS, 2024 WL 966239, at *9 (E.D. Ky. Mar. 6, 2024) (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014)); (*see also* R. 31-1 at Page ID 87 n.72 (citing *Kirkendall*, 2024 WL 966239, at *9). Even so, the Court need not affirmatively decide whether Bays satisfies this element of her prima facie case because her KCRA claim fails for the other reasons discussed.

Additionally, Bays suggests her national origin played a role in her being denied a flexible schedule. (R. 39 at Page ID 925-26). However, Bays has not shown, with citation to relevant authority, how such actions against her factor into the KCRA analysis.

15

absenteeism and overall sub-standard performance" (*see, e.g.*, R. 31-4 at ¶ 6) are pretextual and that discrimination based on her national origin was the real reason she was terminated.[7] As above with Bays's FMLA claims, under Sixth Circuit Title VII precedent, "a plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Romans v. Mich. Dep't of Hum. Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) (internal quotation marks omitted); *see also Gumm v. AK Steel Corp.*, No. 24-1767, 2025 WL 848204, at *3 (6th Cir. Mar. 18, 2025), *cert. denied*, 146 S. Ct. 199 (2025) (quoting *Romans*, 668 F.3d at 839). Bays fails under each method. To be sure, she has offered no evidence to suggest that her documented absences and performance concerns did not actually occur or that such were insufficient to motivate the Board's decision. Likewise, she offers nothing more than mere speculation that her national origin was what motivated the Board to fire her.

In this context, any reliance by Bays on the temporal proximity between when Snyder learned she was Lebanese and when any actions were taken against her falls short of establishing pretext. Indeed, the Sixth Circuit has "long held that temporal proximity alone cannot establish pretext, unless the plaintiff also points to other, independent evidence." *Gumm*, 2025 WL 848204, at *4. And this record is bereft of any "other, independent evidence" to demonstrate the Board's actions were pretextual. Although the record shows Snyder knew Bays was Lebanese, Bays has offered no evidence that remotely shows any actions taken by the Board regarding Bays were motivated by her national origin. (*See, e.g.*, R. 31-2 at Page ID 114-15 (Plaintiff answering, "Well,

---

[7] As discussed above, the Board has carried its burden of production to articulate legitimate nondiscriminatory reasons for its action. Indeed, Bays's absences, tardiness, work performance, and issues relating to trainings she was tasked with leading are well documented. (*See, e.g.*, 31-1 at Page ID 82 ("Plaintiff's performance issues reached their peak when she failed to appear for a blood borne pathogen training, which was required as part of her job description.")).

16

what other reason would it be?" when asked why she believed actions were taken against her because she was Lebanese)).

One final point bears addressing.  In her Response, Bays argues that the Board can be held liable under the "cat's paw" doctrine.  (R. 39 at Page ID 926).  Under this doctrine, an employer may be held liable "[w]hen an adverse hiring decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias."[8]  *Arendale v. City of Memphis*, 519 F.3d 587, 604 n.13 (6th Cir. 2008) (describing this theory alternatively as a "rubber-stamp" theory of liability).  Here, Bays argues that "Snyder—who undisputedly knew of Plaintiff's Lebanese national origin—was front-and-center in revoking her flexible schedule, initiating discipline, and participating in the termination decision" and that "HR, for its part, simply rubber-stamped the actions and input he provided."  (R. 39 at Page ID 926).   But Snyder's knowledge of Bays's national origin is insufficient to establish that discrimination on that ground was the *real reason* actions were taken against her by the Board.  Because Bays has not carried her burden to show the Board's offered reasons were pretextual, her KCRA claim fails.  The Board's Motion for Summary Judgment (R. 31) will therefore be granted on this claim as well.

## IV.   CONCLUSION

For the foregoing reasons, **IT IS ORDERED** as follows:

1)      Defendant's Motion for Summary Judgment (R. 31) is hereby **granted**.

2)      A separate Judgment shall be **entered** contemporaneously herewith.

---

[8] "The term 'cat's paw' derives from a fable in which a monkey tricks a cat into scooping chestnuts out of a fire so that the monkey can eagerly gobble them up, leaving none left for the cat." *Arendale*, 519 F.3d at 604 n.13 (cleaned up).  "Today the term 'cat's paw' refers to one used by another to accomplish his purposes." *Id.* (cleaned up).

Signed this 27th day of March, 2026.



Signed By:

*Candace J. Smith*

United States Magistrate Judge

G:\Judge-CJS\DATA\Orders\civil cov\2024\24-46-CJS MOO re MSJ.docx